# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

ALLSTAR MARKETING GROUP, LLC,             Case No.: 1:23-cv-4251

*Plaintiff,*

v.

GORDON BRUSH MFG. CO., INC.

*Defendant.*

### ALLSTAR MARKETING GROUP, LLC'S MOTION TO QUASH SUBPOENAS

NOW COMES Intervenor Plaintiff ALLSTAR MARKETING GROUP, LLC, ("Allstar"), by and through its counsel, Clausen Miller P.C., who, pursuant to Federal Rule of Civil Procedure 45, hereby moves this Honorable Court to Quash two (2) non-party subpoenas signed by counsel for Defendant, GORDON BRUSH MFG. CO., INC., ("Gordon Bush"), and in support thereof, states as follows:

### INTRODUCTION

On July 13, 2022, Defendant, Gordon Bush, filed a lawsuit in the U.S. District Court for the Southern District of New York entitled *Gordon Brush Mfg. Co., Inc. v. Allstar Marketing Group, LLC,* Case No. 7:22-cv-05978 (KMK)(VR) (the "Underlying Action"). A recitation of the pertinent facts and allegations in the Underlying Action is set forth further below. However, the context for bringing this ancillary action and motion to quash can be neatly summarized by Gordon Brush's overt attempt to use Rule 45 subpoena power as both a 'sword' and a 'shield' – to command that non-parties give Gordon Brush access to premises and property for destructive inspection, **while simultaneously excluding Allstar from observing the same**.

This is an urgent issue of due process, equal access and fundamental fairness, and Allstar is without an alternative to prevent Gordon Brush's spoliation or commingling of evidence. Should this Court not quash or modify Gordon Brush's subpoenas, irrevocable prejudice will result to

Allstar. Secondarily, the subpoenas are defective on their face under Rule 45(c)(2)(A) and must be quashed in any event.

Since June 19, 2023, Allstar has, in good faith, sought to confer repeatedly with Gordon Brush about the nature and intent of Gordon Brush's commanded inspection in order to resolve these issues without the Court's intervention. As will be amply shown through the parties' communications (Exhibit "C" below), Allstar's good faith efforts were stymied by Gordon Brush's lack of candor and purposeful vagueness. In point of fact, it was not until June 29, 2023, that Gordon Brush first expressed that it would not allow Allstar to attend the subpoenaed inspection. And Allstar's suspicion of Gordon Brush's intentions are also founded in Gordon Brush's prior mishandling of non-parties' responses to Gordon Brush's Rule 45 subpoenas in the Underlying Action (delaying production to Allstar for nearly a month after receiving the same and not producing such documents in the same form provided by the non-parties).

## SUMMARY OF FACTS

In the underlying action, Gordon Brush alleges that its stingray-shaped product known as "Foot Mate" was infringed by Allstar's stingray-shaped product known as "Fresh Feet." (A true and accurate copy of the Complaint in 7:22-cv-05978 is attached hereto as **Exhibit "A"**.) There are also other entities engaged in the manufacture and sale of stingray-shaped foot products who have no relation to Allstar whatsoever.

On December 19, 2019, Allstar and Gordon Brush entered into a Trade Dress Licensing Agreement ("Agreement") whereby, *inter alia*: (a) Allstar was allowed to continue manufacturing and selling its "Fresh Feet" product for a period of three years; and (b) the parties mutually released all claims against each other, up to and including the December 19, 2019, effective date of the Agreement.

Allstar sold or disposed of all of its "Fresh Feet" stingray-shaped products prior to the elapse of the Agreement's initial three-year period. The Agreement does not contain any prohibition in

relation to any third parties' re-sale of "Fresh Feet" products that were legitimately manufactured and sold during the licensed period.

In 2021, a dispute arose regarding royalty payments under the Agreement. During the parties' pre-suit discussions, Gordon Brush requested that Allstar destroy the tools and molds from which Allstar's "Fresh Feet" were made, and Allstar complied, providing Gordon Brush with certificates and video recordings of the tools and molds' destruction.

Notwithstanding the foregoing, in the Underlying Action, Gordon Brush alleges that Allstar is still manufacturing and selling "Fresh Feet." Having found no evidence of this, Gordon Brush theorizes that all other stingray-shaped products sold on Amazon.com by entities who have no relation to Allstar must nonetheless come from the same tools and molds from which Allstar previously made its "Fresh Feet" (yes, the same tools and molds which Gordon Brush had Allstar destroy and for which Allstar provided certificates and video recordings of destruction in 2021). Unfortunately for Gordon Brush, its own discovery production disproved this theory.

In discovery, Gordon Brush produced larger photographs of the other stingray-shaped products sold on Amazon.com by entities who have no relation to Allstar. Unlike the smaller versions of these photographs contained in Gordon Brush's underlying Complaint, it is readily apparent from enlarging Gordon Brush's own photographs that the other stingray-shaped products on Amazon.com (known as "Beskar" and "Emoly," respectively) cannot have come from the same tools or molds as Allstar's "Fresh Feet." And Gordon Brush's CEO and President, Kenneth Rakusin, admitted as much during his April 26, 2023 Rule 30(b)(6) deposition when he was shown the photographs demonstrating that the "Beskar" and "Emoly" products bore significant differences from "Fresh Feet" in the placement of holes and other molded features.

Undeterred by his own admission, Mr. Rakusin then openly speculated that the tools and molds destroyed <u>in 2021</u> could have been repaired, and that these modifications are why the "Beskar" and "Emoly" products do not match "Fresh Feet" contours. (*But see*, Rakusin Dep. 119:1-

3: Q. Do you have any evidence that these molds were repaired and used to create new Fresh Feet? A. No.)

Which brings us to the warehouse in Itasca, Illinois owned by 4C Logistics, LLC (the "Premises"). On or about September 15, <u>2020</u>, well before the Gordon Brush-Allstar royalty dispute, and also well before the tools and molds were destroyed (hence, no repair as Mr. Rakusin imagines), a non-party known as NYC Surplus, LLC purchased 452 cartons of "Foot Scrubber w/ Pumice, Frshft" from another non-party with no relation to Allstar (The Mazel Company). As part of the September 15, 2020, sale from The Mazel Company to NYC Surplus, these 452 cartons (each containing 12 individually packaged products) were shipped to 4C Logistics' Itasca warehouse, where, according to 4C Logistics, they remain untouched to this day. It is these 452 cartons (5,424 individually wrapped products) that Gordon Brush intends to breach, open and inspect outside of Allstar's presence on July 20, 2023.

Like Cinderella's shoe, Gordon Brush apparently intends to keep trying out goods stored at 4C Logistics' warehouse until it can find a match to the "Beskar" and "Emoly" products among the thousands of foot scrubbers owned by NYC Surplus. Of course, in order to find that match, Gordon Brush is likely to bring the "Beskar" and "Emoly" products it has purchased to the warehouse for comparison.

Not only will Gordon Brush's breaching of the product packaging destroy the evidence that will directly contradict the packaging allegations in Gordon Brush's underlying Complaint, but there is also a very real and easily foreseeable danger that if Allstar is not present to observe Gordon Brush, commingling or confusion of the Amazon.com and NYC Surplus products and packaging will take place, whether inadvertent or otherwise.

### THE SUBPOENAS

On June 19, 2023, Gordon Brush informed Allstar that on June 28, 2023, it would issue two self-styled "Subpoena to Permit Inspection of Premises" for the warehouse owned by 4C Logistics,

located at 921 Ardmore Ave., Itasca, IL 60143, with such inspection to take place on July 20, 2023. According to the subpoenas, they command that the recipient permit entry onto the designated premises … so that the requesting party may inspect, measure, survey, photograph, test, or sample the property …" Nothing on the face of these subpoenas states any intent to exclude Allstar from the inspection – on the contrary, Gordon Brush's notice to Allstar was mandated by Rule 45(a)(4), whose very purpose includes affording Allstar an opportunity "**to monitor the discovery** and in order to pursue access to any information that may or should be produced." Fed. R. Civ. P. 45 Committee Note, 1991 Amendments (emphasis added).

In the attachment accompanying Gordon Brush's subpoenas, the items to be inspected, "tested" and "sampled" are 452 cartons/5,424 units of "Fresh Feet Foot Scrubber" owned by "NYC Surplus c/o Abe Bernath." Notably, the first of Gordon Brush's subpoenas was directed to NYC Surplus at its address of 944 50th Street, Brooklyn, New York 11219. (A true and accurate copy of Gordon Brush's Subpoenas are attached hereto as **Exhibit "B"**.) Itasca, Illinois is more than 100 miles from Brooklyn, New York. Accordingly, Plaintiff's subpoena fails to comply with Rule 45(c)(2)(A). As can also be seen, the second of Gordon Brush's subpoenas fails to include the owner of the property to be inspected, "tested" or "sampled," *i.e.*, NYC Surplus or Mr. Bernath.

On June 19, 2023, Allstar expressed to Gordon Brush its willingness to attend the inspection. (A true and accurate copy of the email chain between Allstar and Gordon Brush from June 19, 2023, to June 29, 2023 is attached hereto as **Exhibit "C"**.) At the same time, Allstar expressed its reservations about the lack of specificity of what was to be inspected and how, whether the date of the inspection was feasible based upon what was to be inspected and how, and the potential inconvenience posed to the non-parties in relation to the premises and cartons at issue.

From June 19, 2023, through June 28, 2023, Allstar asked Gordon Brush for the details of its proposed inspection. The goal of Allstar's questions was to better understand how the parties might reach a reasonable agreement on protocol for attendance and conducting the same – while

simultaneously seeking to lessen the burden on the non-parties, whose property would be intruded upon, disturbed, and even destroyed in part. As can be seen from Exhibit "C," Gordon Brush was less than forthcoming with its plans, and only informed Allstar for the first time on June 29, 2023, that it would not allow Allstar to be present at all during its inspection, precipitating the instant action and motion.

## LEGAL STANDARD

Fed. R. Civ. P. 45 governs subpoenas, which are typically directed to nonparties. *Young v. City of Chi.,* No. 13 C 5651, 2017 U.S. Dist. LEXIS 394, at *10 (N.D. Ill. Jan. 3, 2017). Pursuant to the 1991 Amendment to Rule 45, "when production or inspection is sought independently of a deposition, other parties may need notice **in order to monitor the discovery** and in order to pursue access to any information that may or should be produced." Fed. R. Civ. P. 45 Committee Note, 1991 Amendments (emphasis added). Gordon Brush does not want Allstar to monitor discovery as intended by the Committee.

As set forth in Rule 45(a)(3), an attorney may issue and sign a subpoena if the attorney is authorized to practice in the issuing Court. But the Court must still protect all persons from abuse under Rule 45 subpoena power, including the parties to the litigation and the non-party receiving the subpoena. *Broadcort Capital Corp. v. Flagler Securities, Inc.* 149 F.R.D. 626, 628 (D. Colo. 1993). Here, it is not only the non-parties that will be prejudiced by Gordon Brush's abuse of Rule 45 subpoena power, but also Allstar, who will be irrevocably prejudiced if Gordon Brush's inspection, testing or sampling of the evidence – including partial destruction – proceeds without Allstar's monitoring.

Generally speaking, the scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules. *Graham v. Casey's Gen. Stores, Inc.,* 206 F.R.D. 251, 253-54 (S.D. Ind. 2002) (citing *Jackson v. Brinker*, 147 F.R.D. 189, 193-94 (S.D. Ind. 1993). But what is good for the goose, is also good for the gander - Gordon Brush cannot claim that the premises and

property is relevant and non-privileged for the purpose of gaining its own access, only to turn around and claim the opposite is true in order to block Allstar from access.

An objecting party such as Allstar has standing to move to quash a subpoena issued to a nonparty if it "claims some personal right or privilege." *Carbajal v. Serra*, Case No. 10-cv-02862-REB-KLM, 2012 U.S. Dist. LEXIS 83172, 2012 WL 2215677, at *2 (D. Colo. June 15, 2012) (citing 9A *Wright, Miller, Kane, & Marcus, Fed. Prac. & Proc. Civ*. § 2459 (3d ed.)). In other words, the right or privilege exists "when the subpoena infringes upon the movant's legitimate interests." *See, e.g., United States v. Gonzales*, No. 10-cr-00396-CMA, 2010 U.S. Dist. LEXIS 109188, 2010 WL 3853324, at *2 (D. Colo. Sept. 28, 2010). Here, Allstar has an absolutely legitimate interest in preserving purported "Fresh Feet" evidence from destruction, commingling or spoliation. (Testing is considered "destructive" if it will "irreversibly alter' a piece of evidence, and here, the "packaging" at issue in the Underlying Complaint will be destroyed if Gordon Brush breaches the same.) *See, e.g., Landi v. Home Depot USA, Inc.*, 2018 U.S. Dist. LEXIS 118619, at *6 (M.D. Fla. July 17, 2018); *Ostrander by Ostrander v. Cone Mills, Inc.*, 119 F.R.D. 417, 419 (D. Minn. 1988).

Further, courts are "not required to permit plaintiff[s] to engage in a 'fishing expedition' in the hope of supporting [a] claim." *Martinez v. Cornell Corr. of Tex.*, 229 F.R.D. 215, 218 (D. N.M. 2005) (quoting *McGee v. Hayes*, 43 Fed. Appx. 214, 217 (10th Cir. July 22, 2002) (unpublished opinion)); *see also, Tottenham v. Trans World Gaming Corp.*, No. 00 Civ. 7697, 2002 U.S. Dist. LEXIS 11313, at * 2 (S.D.N.Y. June 21, 2002) ("Discovery, however, is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support."). Mr. Rakusin may imagine that a post-2021 repair or modification is possible, but there is no possibility that this unsupported speculation can be evidenced by products which have been packaged and in storage since 2020.

In this regard, Rule 45 also provides as follows:

(d) PROTECTING A PERSON SUBJECT TO A SUBPOENA; ENFORCEMENT.
(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.
Fed. R. Civ. P. 45(d)(1).

Indeed, "[n]on-party status is a significant factor to be considered in determining whether the burden imposed by a subpoena is undue." *Whitlow v. Martin*, 263 F.R.D. 507, 512 (C.D. Ill. 2009). Here, because Gordon Brush will not agree to a finite number of units for inspection, non-parties NYC Surplus and 4C Logistics will be burdened by the breaching of the product packaging of potentially thousands of units – and then have to bear the costs of both diminution in value of an opened/unsealed product and the cleaning up/re-stocking of the warehouse.

When a party seeks to object to a subpoena, the objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. *Id.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c); … or (iv) subjects a person to undue burden. Fed. R. Civ. P. 45(d)(3)(A).

Aside from the mandate of the aforementioned rule, deciding whether to grant a motion to quash lies with the sound discretion of the district court. *Lightspeed Media Corp. v. Smith,* No. 3:12-cv-889-DRH-SCW, 2014 U.S. Dist. LEXIS 20252, at *3 (S.D. Ill. Feb. 19, 2014). And, as can be seen in Rule 45(d)(3)(A) above, the Court is not limited to the remedy of quashing the subpoena, but may also modify it. *Ghandi v Police Dept. of Detroit*, 74 FRD 115, 117 (E.D. Mich 1977). Here, because Gordon Brush does not have any discernable protocol, Allstar made a reasonable and fair proposal that would ensure the integrity of the evidence to the maximum extent possible and also provide the parties with equal access. In light of the new concerns raised by Gordon

Brush's attempt to exclude Allstar from the premises, an additional provision has now been added to this protocol to ensure that other stingray-shaped products and their packaging will not be brought to the warehouse without consent and full observation by the opposing party. (A copy of Allstar's proposed protocol, including the additional provision, is attached hereto as **Exhibit "D"**.)

Outside of Rule 45, Fed. R. Civ. P. 26(b)(1) also provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." *Menard v Quest Diagnostics Clinical Labs.,* 2015 US Dist LEXIS 199475, at *4-6 (E.D.La. July 29, 2015). While Rule 34 allows for both non-destructive and destructive testing, testing may be limited by the Court if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in an action, and the importance of the discovery in resolving the issues.'" *Hunley v. Glencore Ltd.,* No. 3:10-cv-455, 2013 U.S. Dist. LEXIS 54259, at *6 (E.D. Tenn. Apr. 17, 2013) (quoting Fed. R. Civ. P. 26(b)(1)(C)). And Rule 26(c)(1) authorizes to issue an order to protect a party from annoyance, oppression or undue burden or expense, including, but not limited to:

>   (A)   forbidding the disclosure or discovery;
>   (B)   specifying terms, including time and place or the allocation of expenses, for the disclosure or discovery;
>   (C)   prescribing a discovery method other than the one selected by the party seeking discovery;
>   (D)   forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;
>   (E)   designating the persons who may be present while the discovery is conducted.

Fed. R. Civ. P. 26(c)(1)(A-E).

The decision to permit or deny destructive testing lies within the sound discretion of the Court. *Nugent v. Hercules Offshore Corp.,* No. 98-3060, 1999 U.S. Dist. LEXIS 20122, at *2 (E.D. La. Dec. 27, 1999) (citing *Dabney v. Montgomery Ward & Co.,* 761 F.2d 494, 498 (8th Cir. 1985)). In doing so, the Court must "balance [] the respective interests by weighing the degree to which

the proposed inspection will aid in the search for the truth against the burdens and dangers created by the inspection." *Ramos v. Carter Exp., Inc.,* 292 F.R.D. 406, 408 (S.D. Tex. 2013); *Krekstein v. McDonald's Corp.*, 341 F.R.D. 575, 578 (E.D. Pa. 2022).

Destructive testing is not a matter of right, *Cameron v. District Court of First Judicial Dist.,* 565 P.2d 925, 929 (Colo. 1977), and the standard applied to requests for destructive testing is more stringent than that applied to routine discovery requests. *Mirchandani v. Home Depot, U.S.A., Inc.,* 235 F.R.D. 611, 615 (D. Md. 2006). Courts generally consider: (1) whether the proposed testing is reasonable, necessary, and relevant to proving the movant's case; (2) whether the non-movant's ability to present evidence at trial will be hindered, or whether the non-movant will be prejudiced in some other way; (3) whether there are any less prejudicial alternative methods of obtaining the evidence sought; and (4) whether there are adequate safeguards to minimize the prejudice to the non-movant, particularly the nonmovant's ability to present evidence at trial. *Mirchandani,* 235 F.R.D. at 613–14. The overriding practical concern in the case of destructive testing has been the formulation of methods for providing full discovery while preserving the rights of all parties to the litigation. *Cameron v. District Court of First Judicial Dist.*, 565 P.2d 925, 931 (Colo. 1977). Here, Allstar seeks to preserve its rights *by* providing for full discovery, *i.e.*, Gordon Brush cannot be allowed to block Allstar from the inspection.

## ARGUMENT

The subpoenas in this case seek inspection of 452 cartons containing 5,424 individually packaged products. (*See*, Exhibit "B".) Setting aside the enormity of this task and lack of any reasonable basis for doing so, by necessity, opening the individual products' packaging to gain access to the contents will result in the destruction of the packaging evidence – evidence placed directly at issue by the allegations of paragraphs 27 and 28 of Gordon Brush's underlying Complaint.

Allstar has timely responded to Gordon Brush's subpoenas via written objection pursuant to Rule 45(d)(2)(B). (*See*, Exhibit "C".) Allstar has also timely commenced this action, and quashing or modification herein is absolutely warranted because of the dangers presented by Gordon Brush's secretive and unmonitored manipulation of the contents for inspection. Again, there is a very real and easily foreseeable danger that if Allstar is not present to observe Gordon Brush, commingling or confusion of the Amazon.com and NYC Surplus products will take place, whether inadvertent or otherwise.

Additionally, the subpoenas are overbroad, unduly burdensome and geographically non-compliant. An overly broad subpoena may be quashed pursuant to Fed. R. Civ. P. 45(d)(3)(A)(iv) as unduly burdensome. *Id.; see also, Margoles v. United States,* 402 F.2d 450, 451 (7th Cir. 1968) (holding that the district court did not abuse its discretion in granting a motion to quash subpoenas as much too broad and unreasonable); *WM High Yield v. O'Hanlon,* 460 F. Supp. 2d 891, 896 (S.D. Ind. 2006) (finding a subpoena inflicted an undue burden because the requests were overly broad).

When evaluating the burdens, courts have used the reasonableness standard. *Flynn v. FCA U.S. LLC,* No. 16-mc-00078 DGW, 2016 U.S. Dist. LEXIS 165278, at *5 (S.D. Ill. Nov. 30, 2016). The question of what is reasonable, of course, depends upon the particular circumstances of the case. *Id.* Essentially, the Court must ask whether "the burden of compliance with [the subpoena] would exceed the benefit of production of the material sought by it." *Shaffner*, 626 F.2d at 38 (citing *Nw. Mem'l. Hosp. v. Ashcroft*, 362 F.3d 923, 927 (7th Cir. 2004)). Here there is no potential benefit that would justify Gordon Brush's intended course of conduct.

Gordon Brush intends that its subpoenas command an unlimited inspection of all the NYC Surplus products located within 4C Logistics' warehouse – potentially in the thousands. Further, Gordon Brush intends to carry out all of its inspections in secret. None of this is reasonable under the circumstances or proportional to the needs of the case. And it is fundamentally unfair to use the Court's subpoena power for one sided discovery, to the irrevocable prejudice of Allstar, who has no

other means of determining what condition any evidence might be in before Gordon Brush starts ripping cartons and packaging open.

Additionally, Gordon Brush's breach of multiple product packaging could cause the non-parties to incur an immense burden in terms of diminution of the products' value and the time, labor or expense of cleaning up afterwards and restocking the products in the warehouse. This is unduly burdensome for NYC Surplus and 4C Logistics and would substantially outweigh any potential benefit in the Underlying Action. Given the vagueness and lack of detail in Gordon Brush's subpoenas, **it is probable (as it was for Allstar) that the non-parties will not have any idea that Gordon Brush intends to engage in such a broad and destructive inspection** until Gordon Brush is already on the premises with its self-styled subpoena in hand, purporting to enforce the Court's authority. Allstar must therefore ask that the Court also act to protect the non-parties, who at present are believed to be unaware (*see,* Exhibit "C", wherein it was expressly asked whether Gordon Brush had discussed the inspection with the non-parties).

Finally, as noted above, if the parties differ as to whether an inspection or test is appropriate, the court must balance the respective interests by weighing the degree to which the proposed inspection will aid in the search for truth against the burdens and dangers created by the inspection. *Ramos v. Carter Exp. Inc.,* 292 F.R.D. 406, 408 (S.D. Tex. 2013); *see also, e.g.*, *In re McNeilus Mfg. Explosion Coordinated Litig.*, 2018 U.S. Dist. LEXIS 174378, at *3–4 (D. Minn. Oct. 9, 2018) (denying request to conduct destructive testing on a hose involved in an explosion because "the fire and explosion may have affected different parts of the hose in very different ways, [and] destroying any part of the hose ex parte would deprive the other parties from performing their own tests on a part of the hose that is certain to be identical or very similar"); *Finjan v. ESET LLC*, 2018 U.S. Dist. LEXIS 172098, at *8–*9 (S.D. Cal. Oct. 4, 2018) (ordering the plaintiff in a patent suit to produce the infringed device for non-destructive testing, which would impose "no burden" on the plaintiff).

In order to minimize the potential prejudice to Allstar, the following well-reasoned safeguards should be employed: (1) adequate opportunity for Allstar to photograph or otherwise record the character and condition of the object to be inspected prior to destruction or manipulation; (2) notice to Allstar of the time, place, and exact manner of the inspection; and (3) reasonable opportunity for Allstar to observe for itself and record the procedures involved in the inspection. *See, e.g., Komar Investments, Inc. v. Zurich Am. Ins. Co.*, 331 F.R.D. 181, 184 (S.D. Fla. 2019); *Mirchandani v. Home Depot, U.S.A., Inc.*, 235 F.R.D. 611, 616–617 (D. Md. 2006). These safeguards are accounted for in Allstar's proposed protocol, Exhibit "D". Thus, if the Court does not quash Plaintiff's subpoenas outright, it is respectfully submitted that the Court should modify the subpoenas to conform to the proposed protocol and foregoing evidentiary safeguards.

WHEREFORE, Allstar respectfully requests this Honorable Court grant its Motion to Quash Gordon Brush's subpoenas to NYC Surplus, LLC and 4C Logistics, LLC, award all reasonable fees and costs associated with Allstar's bringing of the instant action and motion, and for such other and further relief as this Honorable Court deems just and proper.

Dated: July 1, 2023  
Chicago, Illinois

Respectfully submitted,

/s/ *Daniel P. Johnston*  
Daniel P. Johnston  
Katherine M. Kuhn  
Clausen Miller P.C.  
10 South LaSalle, Suite 1600  
Chicago, IL 60603  
(312) 855-1010  
djohnston@clausen.com  
kkuhn@clausen.com  
*Attorneys for Intervenor Plaintiff*  
*Allstar Marketing Group, LLC*

To: Lee Rendeiro  
Henderson, Franklin, Starnes & Holt, P.A.  
1715 Monroe Street  
Fort Meyers, FL 33901  
(239) 344-1179  
Lee.rendeiro@henlaw.com  
*Attorneys for Gordon Brush Mfg. Co., Inc.*